# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:                                                          Chapter 11 Case

Donald Andrew Driggs,                                          Case No.:08-41984

Debtor.

## DEBTOR'S EIGHTH  MODIFIED CHAPTER 11 PLAN OF REORGANIZATION

Donald Andrew Driggs ("Debtor") proposes the following as his Chapter 11 Plan of Reorganization pursuant to the United States Bankruptcy Code.

## I.  INTRODUCTION

Defined Terms.  Terms used in this Plan have the meanings given to them in the Bankruptcy Code unless the context requires otherwise.  In addition, the following definitions will be used for purposes of the Plan:

"Effective Date" means the eleventh (11th) day after the day on which the Court enters an order confirming this plan.  If the eleventh day is a Saturday, Sunday or Holiday, the Effective Date shall be the next day that is not a Saturday, Sunday or Holiday.

## II.  TREATMENT OF CLAIMS AND INTERESTS

### 2.1     Classified Claims and Interests  -  Description of Holders and Treatment

Class 1 - Class of Unsecured Creditors

Class 1 consists of the general unsecured claims against the Debtor ("Class 1 Claims"). Assuming there are no deficiency claims related to the claims secured by the rental properties, the Debtor estimates that Class 1 Claims, including deficiency claims described below, total approximately $1,775,287.

Treatment of Class 1

Creditors holding Class 1 Claims will be paid their pro rata share of  $1,500 per quarter commencing on March 31, 2009 for a total of forty one quarters.  Class 1 claims will also receive their pro-rata share of any proceeds of avoidance actions after payment of costs and administrative expenses incurred in prosecuting such actions.

The payments provided for herein are not less than the Debtor's projected disposable income in accordance with 11 U.S.C. § 1129(a)(15) taking into account gross income less amounts reasonably necessary for the support of the Debtor and payments necessary for the continuation, preservation and operation of the Debtor's business.

Class 2 – Crown Bank

The Class 2 Claim is made up of the Debtor's obligations to Crown Bank under that certain Note dated December 22, 2004 in the original principal amount of $350,000 (the "Class 2 Note").

The Debtor's obligations under the Class 2 Note are secured under that certain Mortgage dated December 22, 2004 (the "Crown Mortgage"), under which the Debtor granted Crown a mortgage interest in the 3990 Sunset property. The Crown Mortgage was recorded in the office of the Hennepin County Recorder on February 7, 2005 (Torrens) and February 9, 2005 (Abstract) as document numbers 8524447 (Abstract) and 74075084 (Torrens).

Class 2 is in a second position of priority on the 3990 Sunset property. The 3990 Sunset property is legally described as follows:

> Lot 26, Togo Park Lake Minnetonka, Hennepin County, Minnesota

As of the Filing Date, the unpaid balance under the Crown Note, including principal and unpaid interest, was $356,684.55. For purposes of the Plan, the fair market value of the 3990 Sunset property will be deemed to be $900,000. As such, Class 2 is partially secured..

Treatment of Class 2 Claim

The Class 2 Note will be amended as follows. The principal will be $300,000. Interest will accrue at the rate of 4.00 % for the five years and if payments are current after five years, the interest will increase to 5.00% for an additional five years. Payments will be amortized over thirty years with the entire principal and any interest owing to be due in full by the maturity date, which will be the 10th anniversary of the Effective Date (or the 5th anniversary if payments are not current on the fifth anniversary. There shall be no prepayment penalties and the outstanding principal and interest may be paid at any time. The remaining terms of the underlying loan documents will remain in effect. To the extent the terms of the original underlying loan documents conflict with the terms of the Plan, the terms of the Plan shall control.

Class 3 – Aurora Loan Services

The Class 3 Claim is made up of the Debtor's obligations to Aurora Loan Services ("Aurora"), under that certain Note dated November 22, 2004 in the original principal amount of $481,300 (the "Class 3 Note").

The Debtor's obligations under the Class 3 Note are secured under that certain Mortgage dated November 22, 2004 (the "Aurora Mortgage"), under which the Debtor granted Aurora a

mortgage interest in the 3245 Hennepin property. The Aurora Mortgage was recorded in the office of the Hennepin County Recorder on January 7, 2005 as document number 8504871.

Class 3 is in a first position of priority on the 3245 Hennepin property. The 3245 Hennepin property is legally described as follows:

> Lot 10, Block 25, Remington's Second Addition, Hennepin County, Minnesota

As of the Filing Date, the unpaid balance under the Aurora Note, including principal and unpaid interest, was $509,896. For purposes of the Plan, the fair market value of the 3245 Hennepin property will be deemed to be $350,000. As such, Class 3 is partially secured and partially unsecured.

Treatment of Class 3 Claim

The Class 3 Note will be amended as follows. The principal will be $350,000. Interest will accrue at the rate of 4.50 % for the term of the loan and the maturity date will remain the same as the original note (November 30, 2034).

For the first three years payments will be interest only and will be $1,313.00. After three years, payments will be amortized over thirty years with the entire principal and any interest owing to be due in full by the maturity date. Payments will be $1,773.00 with a ballon payment at the end of the original term. There shall be no prepayment penalties and the outstanding principal and interest may be paid at any time. The remaining terms of the underlying loan documents will remain in effect. To the extent the terms of the original underlying loan documents conflict with the terms of the Plan, the terms of the Plan shall control.

Aurora Loan Services will have an allowed unsecured claim in the amount of $159,896.

Class 4(a) - CitiMortgage

The Class 4(a) Claim is made up of the Debtor's obligations to CitiMortgage Loan Services ("CitiMortgage"), under that certain Note dated January 29, 2003 in the original principal amount of $560,000 (the "Class 4(a) Note").

The Debtor's obligations under the Class 4(a) Note are secured under that certain Mortgage dated January 29, 2003 (the "CitiMortgage Mortgage"), under which the Debtor granted CitiMortgage a mortgage interest in the 3990 Hennepin property. The CitiMortgage Mortgage was recorded in the office of the Hennepin County Recorder on March 13, 2003 (Abstract) and April 2, 3003 (Torrens) as document numbers 7974914 (Abstract) and 3713492 (Torrens).

Class 4(a) is in a first position of priority on the 3990 Sunset property. The 3990 Sunset property is  legally described as follows:

> Lot 26, Togo Park Lake Minnetonka, Hennepin County, Minnesota

As of the Filing Date, the unpaid balance under the CitiMortgage Note, including principal and unpaid interest, was $605,182.51.  For purposes of the Plan, the fair market value of the 3990 Sunset property will be deemed to be $600,000.  As such, Class 4(a) is fully secured.

Treatment of Class 4(a) Claim

The Class 4(a) Note will be amended as follows.  The principal will be $600,000.00.   Interest will accrue at the rate of 4.50% for the balance of the term of the loan and the maturity date will remain the same as the original note (January 31, 2033).

For the first three years payments will be interest only and will be $2,250.00.  After three years, payments will be amortized over thirty years with the entire principal and any interest owing to be due in full by the maturity date.  After three years, payments will be $3,040.00.  There shall be no prepayment penalties and the outstanding principal and interest may be paid at any time.  The remaining terms of the underlying loan documents will remain in effect.  To the extent the terms of the original underlying loan documents conflict with the terms of the Plan, the terms of the Plan shall control.

Class 4(a) shall have an allowed unsecured claim of $5,182.51.

Class 4(b) – CitiMortgage

The Class 4(b) Claim is made up of the Debtor's obligations to CitiMortgage Loan Services ("CitiMortgage"), under that certain Note dated December 5, 2002 in the original principal amount of $243,740 (the "Class 4(b) Note").

The Debtor's obligations under the Class 4(b) Note are secured under that certain Mortgage dated December 5, 2002 (the "Second CitiMortgage Mortgage"), under which the Debtor granted CitiMortgage a mortgage interest in the 3201 Hennepin property.  The Second CitiMortgage Mortgage was recorded in the office of the Hennepin County Recorder on January 17, 2003 as document number 7920525.

Class 4(b) is in a first position of priority on the 3201 Hennepin property.  The 3201 Hennepin property is legally described as follows:

> Lot 14, Block 24, Remington's Second Addition to Minneapolis, Hennepin County, Minnesota

As of the Filing Date, the unpaid balance under the CitiMortgage Note, including principal and unpaid interest, was $259,347.82.  For purposes of the Plan, the fair market value of the 3201 Hennepin property will be deemed to be $195,000.  As such, Class 4(b) is partially secured and partially unsecured.

Treatment of Class 4(b) Claim

The Class 4(b) Note will be amended as follows.  The principal will be $195,000.  Interest will accrue at the rate of 4.50% for the term of the loan and the maturity date will remain the same as the original note (December 31, 2032).

Payments will be interest only for the first five years and will be $731.00.  After three years, payments will be amortized over thirty years with the entire principal and any interest owing to be due in full by the maturity date.  After three years, payments will be $988.00. There shall be no prepayment penalties and the outstanding principal and interest may be paid at any time.  The remaining terms of the underlying loan documents will remain in effect.  To the extent the terms of the original underlying loan documents conflict with the terms of the Plan, the terms of the Plan shall control.

CitiMortgage will have an allowed unsecured claim in the amount of $64,347.82

Class 5 – Wachovia Mortgage

The Class 5 Claim is made up of the Debtor's obligations to Wachovia Mortgage  ("Wachovia"), under that certain Note dated December 29, 2006 in the original principal amount of $475,000 (the "Class 5 Note").

The Debtor's obligations under the Class 5 Note are secured under that certain Mortgage dated December 29, 2006 (the "Wachovia Mortgage"), under which the Debtor granted Wachovia a mortgage interest in the 809 Portland property.  The Wachovia Mortgage was recorded in the office of the Hennepin County Recorder on January 4, 2007 as document number 4001244.

Class 5 is in a first position of priority on the 809 Portland property.  The 809 Portland property is legally described as follows:

> Lot 13, Block 3, Bryant's addition to St. Paul, Ramsey County, Minnesota

As of the Filing Date, the unpaid balance under the Class 5 Note, including principal and unpaid interest, was $476,783.98.  For purposes of the Plan, the fair market value of the 809 Portland property will be deemed to be $425,000.  As such, Class 5 is partially secured and partially unsecured.

Treatment of Class 5 Claim

The Class 5 Note will be amended as follows.  The principal will be $425,000.  Interest will accrue at the rate of 4.00 % for the term of the loan and the maturity date will remain the same as the original note (December 31, 2036).  However, If Commerce or a related entity purchases the Wachovia mortgage, the Debtor agrees to a modified maturity date of 5 years from the Effective Date of the plan.

Payments will be amortized monthly over thirty years with the entire principal and any interest owing to be due in full by the maturity date.  Payments will be interest only for the first five years of the plan and principal and interest after the first five years There shall be no prepayment penalties and the outstanding principal and interest may be paid at any time. The remaining terms of the underlying loan documents will remain in effect.  To the extent the terms of the original underlying loan documents conflict with the terms of the Plan, the terms of the Plan shall control.

Wachovia Mortgage will have an allowed unsecured claim in the amount of $51,783.98.

Class 6 – Heritage Bank, N.A.

The Class 6 Claim is made up of the Debtor's obligations to Heritage Bank, N.A. ("Heritage"), under that certain Note dated August 18, 2006 in the original principal amount of $115,000 (the "Class 6 Note").

The Debtor's obligations under the Class 6 Note are secured under that certain Mortgage dated August 18, 2006 (the "Heritage Mortgage"), under which the Debtor granted Heritage a mortgage interest in the 29279 145th St. property.  The Heritage Mortgage was recorded in the office of the Kandiyohi County Recorder on August 21, 2006 as document number 543964.

Class 6 is in a first position of priority on the 29279 145th St. property.  The 29279 145th St. property is legally described as follows:

> All that part of the NW ¼ of SW ¼ of Section 4, Township 122, Range 33, Kandiyohi County, Minnesota described as follows:  Beginning at the point of intersection of the East line of the public highway running on and along the West side and line of Section 4 with the North line of the NW ¼ SW ¼ ; thence running East on and along the North line of said quarter-quarter section, for a distance of 200 feet to the point of beginning; thence running South along the East line of the property described below for a distance of 230 feet; thence East perpendicular to the last said line 14 feet; thence North parallel to the East line 230 feet to the North line of said NW ¼ SW ¼; thence West along the said North Line 14 feet to the point of beginning; and there terminating.

> AND

> A tract of land, described by meets and bounds, as follows to-wit: Beginning at the point of intersection of the East line of public highway running on and along the West side and line of Section 4 with the North line of the NW ½ SW ¼ of Section 4. all in Township 122, Range 33, Kandiyohi County, Minnesota; thence running East on and along the North line of said quarter-quarter section for a distance of 200 feet; thence running due south for a distance of 230 feet; thence running due West for a distance of 200 feet and to the East line of the public highway on and along the West line of Section 4, and thence running on and along the east line of said public highway in a northerly direction and to the point of beginning and there terminating.

As of the Filing Date, the unpaid balance under the Class 6 Note, including principal and unpaid interest, was $114,594.21.  For purposes of the Plan, the fair market value of the 29279 145th St. property will be deemed to be $110,000.  As such, Class 6 is partially secured and partially unsecured.

Treatment of Class 6 Claim

The Class 6 Note will be amended as follows.  The principal will be $110,000.  Interest will accrue at the rate of 4.75% for sixty (60) months, and then at prime plus 1%, capped at 6%, for the balance of the term of the loan.  Payments will be amortized over thirty years with the entire principal and any interest owing to be due in full by the maturity date, which shall be the tenth (10th) anniversary of the Effective Date. The Debtor shall bring all property taxes current by December 31, 2009.  There shall be no prepayment penalties and the outstanding principal and interest may be paid at any time.  The remaining terms of the underlying loan documents will remain in effect.  To the extent the terms of the original underlying loan documents conflict with the terms of the Plan, the terms of the Plan shall control.

Heritage Bank may file an unsecured claim for any amounts owed to it in excess of $110,000 and the Debtor will not object to such claim.

Class 7 – Wells Fargo

The Class 7 Claim is made up of the Debtor's obligations to Wells Fargo ("Wells Fargo"), under that certain Note dated December 19, 2002 in the original principal amount of $100,000 (the "Class 7 Note").

The Debtor's obligations under the Class 7 Note are secured under that certain Mortgage dated December 19, 2002 (the "Wells Fargo Mortgage"), under which the Debtor granted Wells Fargo a mortgage interest in the 29317 145th St. property.  The Wells Fargo Mortgage was recorded in the office of the Kandiyohi County Recorder on December 23, 2002 as document number 492513.

Class 7 is in a first position of priority on the 29317 145th St. property.  The 29317 145th St. property is legally described as follows:

> That part of the South 20 rods of the West 16 rods of the SW 1/4 of the NW 1/4 of Section 4,  Township 122, Range 33, Kandiyohi County, Minnesota lying south of the following described line:  Commencing at the southwest corner of said SW 1/4 of the NW 1/4 thence on an assumed bearing of N 00 degrees 22 minutes 16 seconds W, along the west line of said SW 1/4 of the NW 1/4, a distance of 161.77 feet to the point of beginning of the line to be described; thence N 89 degrees 34 minutes 51 seconds E to the east line of said South 20 rods of the West 16 rods, and said described line terminating.

As of the Filing Date, the unpaid balance under the Class 7 Note, including principal and unpaid interest, was $96,121.34.  For purposes of the Plan, the fair market value of the 29317 145th St.

property will be deemed to be $80,000.  As such, Class 7 is partially secured and partially unsecured.

Treatment of Class 7 Claim

The Class 7 Note will be amended as follows.  The principal will be $90,000.  Interest will accrue at the rate of 4.75 % for 5 years, 5.5% for the balance of the term of the loan and the maturity date will remain the same as the original note (December 31, 2032).

Payments will be interest only for the first three years and will be $356.00, and then the remaining balance will be amortized over thirty years with the entire principal and any interest owing to be due in full by the maturity date.  After three years payments will be $469.00.  There shall be no prepayment penalties and the outstanding principal and interest may be paid at any time.  The remaining terms of the underlying loan documents will remain in effect.  To the extent the terms of the original underlying loan documents conflict with the terms of the Plan, the terms of the Plan shall control.

Wells Fargo will have an allowed unsecured claim in the amount of $16,121.34.

Class 8 – St. Stephen State Bank

The Class 8 Claim is made up of the Debtor's obligations to St. Stephen State Bank ("St. Stephen"), under that certain Note dated July 12, 2005 in the original principal amount of $150,000 (the "Class 8 Note").

The Debtor's obligations under the Class 8 Note are secured under that certain Mortgage dated July 12, 2005 (the "St. Stephen 3022 Mortgage"), under which the Debtor granted St. Stephen a mortgage interest in the 3022 Hennepin property.  The St. Stephen 3022 Mortgage was recorded in the office of the Hennepin County Recorder on November 7, 2006 as document number 4258564.

The Debtor's obligations under the Class 8 Note are also secured under that certain Mortgage dated July 12, 2005 (the "St. Stephen 4400 Mortgage"), under which the Debtor granted St. Stephen a  mortgage interest in the 4440 Deering Island property.  The St. Stephen 4400 Mortgage was recorded in the office of the Hennepin County Recorder on May 12, 2006 as document number 4258564.

Class 8 is in a second position of priority on the 3022 Hennepin property.  The 3022 Hennepin property is legally described as follows:

> Lot 6, Block 16, "Calhoun Park," Hennepin County, Minnesota

Class 8 is in a second position of priority on the 4400 Deering Island property.  The 4400 Deering Island property is legally described as follows:

Government Lot 9, Section 18, Township 117 North, Range 23 of the West Principal
Meridian, Hennepin County, Minnesota

As of the Filing Date, the unpaid balance under the Class 8 Note, including principal and unpaid
interest, was $155,674.  The balance has increased and as of the date of confirmation will be
$178,466.33.  For purposes of the Plan, the fair market value of the 3022 Hennepin property will
be deemed to be $800,000and the .  fair market value of the 4400 Deering Island will be deemed
to be $800,000.  As such, Class 8 is fully secured.

Treatment of Class 8 Claim

The Class 8 Note will be amended as follows.  The principal will be $178,466.33.  Interest will
accrue at the rate of prime plus 1% with a floor of 5.75% and a ceiling of 7.75 %. The maturity
date will be the seventh (7th) anniversary of the Effective Date and the balance will be amortized
over twenty five years with the entire principal and any interest owing to be due in full by the
maturity date. There shall be no prepayment penalties and the outstanding principal and interest
may be paid at any time.  The remaining terms of the underlying loan documents will remain in
effect.  To the extent the terms of the original underlying loan documents conflict with the terms
of the Plan, the terms of the Plan shall control.  If requested by the bank, the Debtor will sign a
new promissory note reflecting these terms.

Class 9 – Chase Manhattan Mortgage Corporation n/k/a Chase Home Finance, LLC

The Class 9 Claim is made up of the Debtor's obligations to Chase Manhattan Mortgage
Corporation n/k/a Chase Home Finance, LLC ("Chase"), under that certain Note dated March 20,
2003, in the original principal amount of $640,650.00 ("Chase Note").

The Debtor's obligations under the Chase Note are secured under that certain Mortgage dated
March 20, 2003 ("Chase Mortgage"), by which Debtor granted Chase a mortgage interest in the
4400 Deering Island property.  The Chase Mortgage was registered in the Office of the Hennepin
County Registrar of Titles on April 22, 2003, as document number 3723337, on Certificate No.
1104721.

Chase is in a first/senior position of priority on the 4400 Deering Island property, which is
legally described as follows:

Government Lot 9, Section 18, Township 117 North, Range 23 West of the Fifth Principal
Meridian, Hennepin County, Minnesota.

As of the Ch. 11 Petition Filing Date, the unpaid balance under the Chase Note and Mortgage
was $647,627.88.  Chase's Mortgage is fully secured.

Treatment of Class 9/Chase's Claim:

Chase was granted relief from the automatic stay in this case on December 9, 2008 by the Court,
entitling it to immediately proceed with foreclosing its mortgage upon the property and pursuing

related remedies, in accordance with Minnesota statutes.  Chase intends to foreclose its mortgage.

In December 2008, Chase and Debtor agreed to the following as a compromise and settlement for Chase to foreclose its mortgage and Debtor to allow the foreclosure to be completed if Debtor could not have a Plan promptly confirmed:

If Debtor's Plan is not confirmed by the court before the time Chase has a Sheriff's Sale held in connection with the foreclosure of its Mortgage, or, if Debtor's Plan is not confirmed by April 30, 2009, whichever occurs earlier, then Chase, its successors, agents and assigns, (and the Chase Note and Mortgage) shall not be bound or affected by any plan provisions in this case regardless of any subsequent confirmation by the Court, and any plan provisions that would otherwise modify or affect the rights of the holder or servicer of the Chase Note and Mortgage shall be deemed void and of no effect.  Further, Chase's foreclosure of its mortgage and any related eviction actions shall not be affected by this bankruptcy case.

If Debtor's Plan is confirmed by the Court both before April 30, 2009 and before the time Chase has had a Sheriff's Sale held in connection with the foreclosure of its Mortgage, then Chase's Note and Mortgage will have the following modified terms:  The principal balance will be $647,627.99.  Interest will accrue at the rate of 5.5% per annum, amortized over 30 years, and a balloon payment shall be due 10 years from date of Plan confirmation  (i.e., all sums due under the Note and Mortgage shall be immediately accelerated, due and payable on the 10 year anniversary/maturity date).  There shall be no prepayment penalties.  Debtor shall continue to be obligated to escrow for taxes and insurance.  The remaining terms of the Chase Note and Mortgage, to the extent they do not conflict with the specific terms herein, shall remain fully in force and effect.

<u>Class 10 – Home Federal Savings Bank</u>

The Class 10 Claim is made up of the Debtor's obligations to Home Federal Savings Bank ("Home Federal"), under that certain Note dated November 22, 2002 in the original principal amount of $75,000 (the "Class 10 Note").

The Debtor's obligations under the Class 10 Note are secured under that certain Mortgage dated November 22, 2002 (the "Home Federal Mortgage"), under which the Debtor granted Home Federal a mortgage interest in the 2925 Casco Pt. property.  The Home Federal Mortgage was recorded in the office of the Hennepin County Recorder on January 3, 2003 as document number 7904718.

Class 10 is in a second position of priority on the 2925 Casco Pt. property.  The 2925 Casco Pt. property is legally described as follows:

> Lots 96 and 107, of Spring Park, according to the recorded plat thereof, and situated in Hennepin County, Minnesota.  And all that part vacated Lake Shore Avenue and the tract of land lying between said vacated Lake Shore Avenue and shore of lake defined by an extension of the boundary lines of Lot 96

As of the Filing Date, the unpaid balance under the Class 10 Note, including principal and unpaid interest, was $77,707.75.  For purposes of the Plan, the fair market value of the 2925 Casco Pt. will be deemed to be $600,000.  As such, Class 10 is unsecured.

Treatment of Class 10 Claim

Class 10 shall have an allowed unsecured claim of $77,705.75.  The Class 10 creditor shall sign a release of mortgage provided by the Debtor for the 2925 Casco Pt. property.

Class   11 – Lehman Brothers Bank

The Class 11 Claim is made up of the Debtor's obligations to Lehman Brothers Bank ("Lehman"), under that certain Note dated March 16, 2006 in the original principal amount of $910,000 (the "Class 11 Note").

The Debtor's obligations under the Class 11 Note are secured under that certain Mortgage dated March 16, 2006 (the "Lehman Mortgage"), under which the Debtor granted Lehman a mortgage interest in the 2925 Casco Pt. property.  The Lehman Mortgage was recorded in the office of the Hennepin County Recorder on April 17, 2006 as document number 8780189.

Class 11 is in a  first position of priority on the 2925 Casco Pt. property.  The 2925 Casco Pt. property is legally described as follows:

> Lots 96 and 107, of Spring Park, according to the recorded plat thereof, and situated in Hennepin County, Minnesota.  And all that part vacated Lake Shore Avenue and the tract of land lying between said vacated Lake Shore Avenue and shore of lake defined by an extension of the boundary lines of Lot 96

As of the Filing Date, the unpaid balance under the Class 11 Note, including principal and unpaid interest, was $909,552.  For purposes of the Plan, the fair market value of the 2925 Casco Pt. property will be deemed to be $600,000.  As such, Class 11 is partially secured and partially unsecured.

Treatment of Class 11 Claim

The Class 11 Note will be amended as follows.  The principal will be $600,000.  Interest will accrue at the rate of 4.5 % for the term of the loan and the maturity date will remain the same as the original note (March 31, 2036).

For the first three years payments will be interest only and will be $2,250.00.  After three years, payments will be amortized over thirty years with the entire principal and any interest owing to be due in full by the maturity date.  After three years, payments will be $3,040.00.  There shall be no prepayment penalties and the outstanding principal and interest may be paid at any time. The remaining terms of the underlying loan documents will remain in effect.  To the extent the

terms of the original underlying loan documents conflict with the terms of the Plan, the terms of the Plan shall control.

Lehman Brother Bank shall have an allowed unsecured claim for $309,552.

Class   12 – JT & TJ, Inc.

The Debtor disputes this claim.  The Class 12 Claim is made up of the Debtor's obligations to JT & TJ, Inc.("JT & TJ"), under that certain Note dated February 27, 2007 in the original principal amount of $100,000 (the "Class 12 Note").

The Debtor's obligations under the Class 12 Note are secured under that certain Mortgage dated February 27, 2007 (the "JT & TJ Mortgage"), under which the Debtor granted JT & TJ a mortgage interest in the 2925 Casco Pt. property.  The JT & TJ Mortgage was recorded in the office of the Hennepin County Recorder on March 26, 2007 as document number 8955309.

Class 12 is in a third position of priority on the 2925 Casco Pt. property. The 2925 Casco Pt. property is legally described as follows:

> Lots 96 and 107, of Spring Park, according to the recorded plat thereof, and situated in Hennepin County, Minnesota.  And all that part vacated Lake Shore Avenue and the tract of land lying between said vacated Lake Shore Avenue and shore of lake defined by an extension of the boundary lines of Lot 96

Class 12 is unsecured.

Treatment of Class 12 Claim

Class 12 shall have an allowed claim of $0.  The Class 12 creditor shall sign a release of mortgage provided by the Debtor for the 2925 Casco Pt. property.

Class   13 – State Bank of Delano

The Class 13 Claim is made up of the Debtor's obligations to the State Bank of Delano ("Delano"), under that certain Note dated December 19, 2005 in the original principal amount of $1,244,000 (the "Class 13 Note").

The Debtor's obligations under the Class 13 Note are secured under that certain Mortgage dated December 19, 2005 (the "First Delano Mortgage"), under which the Debtor granted Delano a mortgage interest in the 4400 Deering Island property.  The First Delano Mortgage was recorded in the office of the Hennepin County Recorder on March 21, 2006 as document number 4238401.

The Debtor's obligations under the Class 13 Note are also secured under a purported Mortgage dated December 19, 2006 (the "Second Delano Mortgage"), under which the Debtor individually granted Delano a mortgage interest in nonestate property located in Wright County, Minnesota.

The Second Delano Mortgage was recorded in the office of the Wright County Recorder on March 7, 2006 as document number 1000678.  However, the Wright County Property is owned not by the Debtor but by One Mile Long, LLC.

Class 13 is in a third position of priority on the 4400 Deering Island property. The 4400 Deering Island property is legally described as follows:

> Government Lot 9, Section 18, Township 117 North, Range 23 of the West Principal Meridian, Hennepin County, Minnesota

As of the Filing Date, the unpaid balance under the Class 13 Note, including principal and unpaid interest, was $1,348,378.  The fair market value of the 4400 Deering Island property will be deemed to be $800,000 and the fair market value of the Wright County Property will be deemed to be $900,000.  As such, Class 13 is unsecured.  As the third mortgage holder on the Deering Island property, the secured claim on this property is worth $0.

Treatment of Class 13 Claim

Class 13 shall have an allowed unsecured claim of $448,378.02.  The Class 13 creditor shall sign a release of mortgage provided by the Debtor for the Deering Island property.

Class 14(a) – Commerce Bank

The Class 14(a) Claim is made up of the Debtor's obligations to Commerce Bank ("Commerce"), under that certain Note dated March 29, 2004 in the original principal amount of $525,000 (the "Class 14(a) Note").

The Debtor's obligations under the Class 14(a) Note are secured under that certain Mortgage dated March 29, 2004 (the "Commerce Mortgage"), under which the Debtor granted Commerce a mortgage interest in the 3022 Hennepin property.  The Commerce Mortgage was recorded in the office of the Hennepin County Recorder on March 30, 2004 as document number 3939938.

Class 14(a) is in a first position of priority on the 3022 Hennepin property.  The 3022 Hennepin property is legally described as follows:

> Lot 6, Block 16, "Calhoun Park," Hennepin County, Minnesota

As of the Filing Date, the unpaid balance under the Class 14(a) Note, including principal and unpaid interest, was $543,902.61.  Commerce has filed an amended proof of claim indicating further interest and fees have accrued, and has incurred further fees and costs bringing the total amount due under the promissory note to approximately $700,000. For purposes of the Plan, the fair market value of the 3022 Hennepin property will be deemed to be $800,000.  As such, Class 14(a) is fully secured.

Commerce Bank also claims a security interest in certain personal property of the Debtor by virtue of a "Commercial Security Agreement" signed by the Debtor related to his purchase of the Suburban World Theatre.  The agreement provides for security in the following collateral:

> Purchase Money Security Interest in all business assets including restaurant equipment located at 3022 Hennepin Ave.
>
> Accounts and other rights to payment
>
> Inventory
>
> Equipment
>
> Instruments and Chattel Paper
>
> General Intangibles
>
> Deposit Accounts.

The Debtor's intent in entering into the agreement was that only assets of the theater business would secure this loan.  It appears that Commerce Bank believes that the assets to secure its loan are not limited to the theatre.  The Debtor believes this is overreaching and could constitute bad faith, which Commerce disputes.  Also, many items in which Commerce apparently claims a lien are exempt and any such lien that is not a purchase money lien can be avoided pursuant to 11 U.S.C. § 522(f).

Treatment of Class 14(a) Claim

The Class 14(a) Note will be amended as follows.  The principal will be $700,000.  Interest will accrue at the rate of 6 %  Payments will calculated at a rate of 4% and the 2% difference between 6% and 4% will be due at maturity as yield maintenance.  Monthly payments will begin 30 days after the Effective Date in the amount of interest only through December 31, 2009 .  Payments will be adjusted as of January 1, 2010 to consist of principal and interest amortized over 30 years with the entire principal, any interest owing, yield maintenance and costs payable in full on the third anniversary of the Effective Date. There shall be no prepayment penalties and the outstanding principal, interest and other costs and charges may be paid at any time.

If the Debtor has been in compliance with the terms of the Bank's treatment following the Effective Date, at maturity Commerce will provide a two (2) year extension and the interest rate will be adjusted to Commerce's market rates at a rate no higher than 300 basis points over then FHLB of Des Moines 2 year long term advance rate, with a cap rate of 7.00% and a floor of 6.00%.

The Debtor may transfer ownership of the 3022 Hennepin Property to a limited liability company of which he is the sole owner.  All of the Debtor's obligations to Commerce shall remain in full

force and effect and the transferee shall also assume all the Debtor's obligations to Commerce Bank.

The Debtor must demonstrate a good faith effort at refinancing this loan in the six (6) months prior to the third anniversary of the Effective Date. The Debtor will provide Commerce with full access to information regarding his effort to refinance.

In the event of a default, Commerce shall provide the Debtor notice of default by cell phone, e-mail, or fax, and by U. S. mail addressed to the Debtor at 3201 Hennepin and the Debtor shall have thirty (30) days after such notice to cure any default. Defaults include all standard defaults in the underlying loan documents, including payment of debt, taxes, insurance and escrows.

The Debtor covenants to deposit a minimum of cash sufficient for payment on a monthly basis of all Class 14(a) debt service (calculated at the 4% rate), and tax and insurance escrows. In addition, the Debtor shall maintain a Debt Service Coverage Ratio with respect to the income and expenses of 3022 Hennepin of 1:1 until December 31, 2010, and of 1.2:1 thereafter.

The Debtor will be required to make the required payments and escrow deposits on time, and the loan will have a standard late payment fee of 5% if more than 10 days past due, regardless of the default cure period. The loan will have a default rate of 12%  Commerce Bank shall not have the right to offset any funds from the Debtor's account (except to pay the required payments and escrow deposits if not timely made by Debtor), and shall not prohibit the Debtor from making payments out of such account for any purpose, unless the Debtor defaults on payment of principal, interest, escrows or if nonsufficient funds exist in the account for a presented check. Commerce shall immediately notify the Debtor by phone, fax or e-mail of any intent to not honor a presented check.

The remaining terms of the underlying loan documents will remain in effect, however as to prepetition property taxes such taxes may be paid pursuant to the terms of the treatment of Hennepin County as Class 21. To the extent the terms of the original underlying loan documents conflict with the terms of the Plan, the terms of the Plan shall control.

The Debtor will provide a voluntary foreclosure agreement dated as of the Effective Date, and a memorandum thereof that Commerce may file within the time prescribed by law. If the Debtor defaults on his obligations under Class 14(a), Commerce Bank shall be entitled to commence voluntary foreclosure if such default not been cured after thirty days' notice of such default.

Commerce's vote in favor of this plan shall result in the Debtor's release of Commerce Bank for any claims based on any facts that existed as of the Effective Date, and shall also constitute a release of Commerce Bank's security interest in any property of the Debtor other than personal property related to the Suburban World Theatre that is listed on the attached Exhibit 14(a), which consists of property properly subject to Commerce Bank's purchase money security interest and includes the property purchased by virtue of Commerce Bank's loan. Confirmation of the plan shall also constitute a release by the bank of any claims against the Debtor as of the Effective Date except for the Debtor's obligations under this plan.

The Debtor and Commerce have entered into a Forbearance and Loan Modification Agreement with respect to Class 14(a) and Class 14 (d), which will control over any conflicting provision in this Plan, and which is a condition to Commerce's vote in favor of this plan.  There shall be no cross default provision between Class 14(a) and Class 14(d).  The Loan Modification Agreement is attached as Exhibit B.

Class 14(b) – Commerce Bank

The Class 14(b) Claim is made up of the Debtor's obligations to Commerce Bank ("Commerce"), under that certain Note dated September 29, 2004 in the original principal amount of $50,000 (the "Class 14(b) Note").

The Debtor's obligations under the Class 14(b) Note are secured under that certain Mortgage dated September 29, 2004 (the "3253 Commerce Mortgage"), under which the Debtor granted Commerce a mortgage interest in the 3253 Holmes property.  The 3253 Commerce Mortgage was recorded in the office of the Hennepin County Recorder on October 21, 2004 as document number 4032250.

Class 14(b) is in a second position of priority on the 3253 Holmes property.  The 3253 Holmes property is legally described as follows:

> Lot 8; and the South 4 feet front and rear of Lot 9, Block 45, "Calhoun Park," Hennepin County, Minnesota

As of the Filing Date, the unpaid balance under the Class 14(b) Note, including principal and unpaid interest, was $51,662.64.   The 3253 Holmes property has gone through foreclosure and the redemption period expires on October 11, 2008.

Treatment of Class 14(b) Claim

If the Debtor can sell the 3253 Holmes property he will either pay Class 14(b) in full or negotiate a reduced amount.  If the Debtor cannot sell the property in advance of the last day to redeem the property and redemption is not made, the Class 14(b) claim will be treated in Class 1 as unsecured unless Commerce redeems the property in which case Commerce will receive $0 on its Class 14(b) claim and Commerce will have an allowed unsecured claim of $51,662.64.

Class 14(c) – Commerce Bank

The Class 14(c) Claim is made up of the Debtor's obligations to Commerce Bank ("Commerce"), under that certain Note dated June, 4, 2004 in the original principal amount of $150,000 (the "Class 14(c) Note").

The Debtor's obligations under the Class 14(c) Note are secured under that certain Mortgage dated June 4, 2004 (the "4400 Commerce Mortgage"), under which the Debtor granted Commerce a mortgage interest in the 4400 Deering Island property.  The 4400 Commerce

Mortgage was recorded in the office of the Hennepin County Recorder on March 20, 2008 as document number 4480023.

Class 14(c) is in a fifth position of priority on the 4400 Deering Island property. The 4400 Deering Island property is legally described as follows:

> Government Lot 9, Section 18, Township 117 North, Range 23 of the West Principal Meridian, Hennepin County, Minnesota

As of the Filing Date, the unpaid balance under the Class 14(c) Note, including principal and unpaid interest, was $146,996. For purposes of the Plan, the fair market value of the 4400 Deering Island property will be deemed to be $800,000. As such, Class 14(c) is unsecured. This mortgage is also clearly avoidable as a preference.

Treatment of Class 14(c) Claim

Class 14(c) shall have an allowed unsecured claim of $146,996. The Class 14(c) creditor shall sign a release of mortgage provided by the Debtor for the 4400 Deering Island property.

Class 14(d) – Commerce Bank

The Class 14(d) Claim is made up of the Debtor's obligations to Commerce Bank ("Commerce"), under that certain Note dated July 31, 2007 (the "Class 14(d) Note"). This loan was a line of credit "up to a maximum of $175,000" and the original amount loaned was less than $2,000. As such, it was in an original principal amount of far less than $100,000. Under the very terms of the note, it is possible the principal amount would never reach $100,000 regardless of the current principal.

Minnesota Statute § 559.17 provides that an assignment rents is enforceable only if it secures "an original principal amount of $100,000 or more or is a lien upon residential real estate containing more than four dwelling units." 3390 Sunset has less than 4 units and the "original principal amount of the mortgage" was less than $100,000. As such, any assignment of rents is unenforceable. Commerce Bank has requested that the Debtor disclose that Commerce disputes that the assignment is not enforceable.

The Debtor's obligations under the Class 14(d) Note are alleged to be secured under the following mortgages:

1. Mortgage dated July 31, 2007 (the "3990 Commerce Mortgage"), under which the Debtor granted Commerce a mortgage interest in the 3990 Sunset property. The 3990 Commerce Mortgage was recorded in the office of the Hennepin Registrar of Titles on August 7, 2007 as Document number 4413865 ("Torrens"). This property is also Abstract property and as such this mortgage is not properly perfected.

Class 14(d) is in a third position of priority on the 3990 Sunset property. The 3990 Sunset Property is legally described as follows:

> Lot 26, Togo Park Lake Minnetonka, Hennepin County, Minnesota

This mortgage is avoidable and unsecured.  As noted, this property is part abstract and part Torrens.  Class 14(d) failed to perfect its mortgage in the abstract portion.  The property cannot be partitioned. and the building is located primarily on the abstract portion.  Commerce believes that the mortgage is not avoidable because it alleges that a search of the title examiner's Torrens Certificate would reveal the existence of the mortgage.  The Debtor disputes that this constitutes a proper perfection of  the mortgage.

2.      Mortgage dated July 31, 2007 (the "3253 Commerce Mortgage"), under which the Debtor granted Commerce a mortgage interest in the 3253 Holmes property.  The 3253 Commerce Mortgage was recorded in the office of the Hennepin County Recorder on August 7, 2007 as document number 4413865.

Class 14(d) is in a third position of priority on the 3253 Holmes property.  The 3253 Holmes property is legally described as follows:

> Lot 8; and the South 4 feet front and rear of Lot 9, Block 45, "Calhoun Park,"
> Hennepin County, Minnesota

This mortgage is unsecured.

3.      Mortgage dated July 31, 2007 (the "809 Commerce Mortgage"), under which the Debtor granted Commerce a mortgage interest in the 809 Portland property.  The 809 Commerce Mortgage was recorded in the office of the Ramsey County Recorder on August 22, 2007 as document number 4050226.

Class 14(d) is in a second position of priority on the 809 Portland property.  The 809 Portland property is legally described as:

> Lot 13, Block 3, Bryant's addition to St. Paul, Ramsey County, Minnesota

The Debtor believes this mortgage is unsecured, but Commerce Bank has filed an election under 11 U.S.C. § 1111(b)(2). The Debtor has filed on objection to Commerce Bank's 1111(b) election.

4.      Mortgage dated July 31, 2007 (the "Second 4400 Commerce Mortgage"), under which the Debtor granted Commerce a mortgage interest in the 4400 Deering Island property.  The Second 4400 Commerce Mortgage was recorded in the office of the Hennepin County Recorder on August 7, 2007 as document number 4413865.

Class 14(d) is in a fourth position of priority on the 4400 Deering Island property.  The 4400 Deering Island property is legally described as follows:

Government Lot 9, Section 18, Township 117 North, Range 23 of the West Principal
Meridian, Hennepin County, Minnesota

This mortgage is unsecured.

As of the Filing Date, the unpaid balance under the Class 14(d) Note, including principal and
unpaid interest, was $175,743.

Treatment of Class 14(d) Claim

Confirmation of the plan shall constitute an order overruling the Debtor's objection to
Commerce Bank's 1111(b) election.  Class 14(d) shall retain its lien on the 809 Portland property
in the  amount of $160,000 and shall sign a release of mortgage provided by the Debtor for the
4400 Deering Island property and the 3990 property.  If any mortgages were provided by the
Debtor on any other properties to secure this claim, which have not been filed, Commerce Bank
shall return the original mortgages to the Debtor, if available, or shall furnish releases of such
mortgages, and such mortgages shall be deemed null and void.

The Class 14(d) Note will be amended as follows.  The principal will be $160,000.  Interest will
accrue at the rate of 6 %  Payments will calculated at a rate of 4% and the 2% difference between
6% and 4% will be due at maturity as yield maintenance. Monthly payments will begin 30 days
after the Effective Date in the amount of interest only through December 31, 2009 .  Payments
will be adjusted as of January 1, 2010 to consist of principal and interest amortized over 30 years
with the entire principal, any interest owing, yield maintenance and costs payable in full on the
third anniversary of the Effective Date. There shall be no prepayment penalties and the
outstanding principal, interest and other costs and charges may be paid at any time.

If the Debtor has been in compliance with the terms of the Bank's treatment following the
Effective Date, at maturity Commerce agrees to  provide a two (2) year extension and the interest
rate will be adjusted to 250 basis points over the then FHLB of Des Moines 2 year long term
advance rate, with a cap of 7% and a floor of 6%.

If Commerce or a related entity purchases the Wachovia Mortgage note (Class 5), at maturity
Commerce agrees to  provide a two (2) year extension and the interest rate will be adjusted to
250 basis points over the then FHLB of Des Moines 2 year long term advance rate, with a cap of
6% and no floor rate (for example, the rate of as April 2, 2008 would be 4.58%).

The Debtor may transfer ownership of the 809 Portland Property to a limited liability company
of which he is the sole owner.  All of the Debtor's obligations to Commerce shall remain in full
force and effect and the transferee shall also assume all the Debtor's obligations to Commerce
Bank.

The Debtor must demonstrate a good faith effort at refinancing this loan in the six (6) months
prior to the third anniversary of the Effective Date.  The Debtor will provide Commerce with full
access to information regarding his effort to refinance.

The Debtor will maintain an account for 809 Portland at Commerce Bank and all rents shall be paid by tenants directly to Commerce Bank and deposited into this account.  If Wachovia Bank does not escrow for taxes and insurance, Commerce Bank may escrow funds from this account for taxes and insurance.  Commerce Bank shall not have the right to offset any funds from such account (except to pay the required payments and escrow deposits if not timely made by Debtor), and shall not prohibit the Debtor from making payments out of such account for any purpose, unless the Debtor defaults on payment of principal or interest on the Wachovia mortgage, the 809 Commerce Mortgage, on taxes or on insurance, or if nonsufficient funds exist in the account for a presented check.  Commerce shall immediately notify the Debtor by phone, fax or e-mail of any intent to not honor a presented check.

Commerce may at any time and from time to time send a letter to tenants, after conferring with the Debtor regarding the contents of such letter, confirming the terms of the tenants' leases with the Debtor and requiring the tenants to directly send their rents by mail or electronic debit to Commerce Bank, and such letter will clearly indicate that the Debtor is still the owner of the property, the property manager and the contact person for this property.

The Debtor will manage the property and no management fee is to be paid, however the Debtor has the right to use excess funds from the rents after payment of the Wachovia mortgage, the 809 Commerce Mortgage, escrow for taxes and insurance and property expenses.  The Debtor will maintain all seven units of the property in rentable condition and have no more than two (2) weeks downtime for turnover and repair, unless circumstances beyond his control require more than two (2) weeks downtime. The Debtor will be required to make the required payments and escrow deposits on time, and the loan will have a standard late payment fee of 5% if more than 10 days past due, regardless of  the default cure period. The loan will have a default rate of 12%.

The Debtor must make a good faith effort to maintain rents at 75% of full occupancy or $3,950 per month. No tenant may live rent free at any time while Commerce has a lien on this property. If a tenant defaults the Debtor must immediately move to evict such tenant.  The Debtor shall have three months from the date of eviction to re-rent the unit, but if the Debtor is unable to do so shall have another three months to re-rent the unit so long as funds are deposited in the account, prior to the due date for rent payments, that are sufficient to pay principal and interest on the Wachovia mortgage, the 809 Commerce Mortgage, all escrows, utilities and maintenance expenses necessary to keep all units available to rent.

In the event of a default, Commerce shall provide the Debtor notice of default by cell phone, fax or e-mail and by U.S. mail addressed to the Debtor at 3201 Hennepin, and the Debtor shall have thirty (30) days after such notice to cure any default.  Defaults include all standard defaults in the underlying loan documents, including payment of debt, taxes, insurance and escrows.

The Debtor will provide a voluntary foreclosure agreement as to 809 Portland dated as of the Effective Date, and a memorandum thereof that Commerce may file within the time prescribed by law. If the Debtor defaults on his obligations under Class 14(d), Commerce Bank shall be entitled to commence voluntary foreclosure if such default not been cured after thirty days' notice of such default.

Class 15 – Indy Mac

The Class 15 Claim is made up of the Debtor's obligations to Indy Mac Bank ("Indy Mac"), under that certain Note dated April 14, 2004 in the original principal amount of $422,000 (the "Class 15 Note").

The Debtor's obligations under the Class 15 Note are secured under that certain Mortgage dated April 14, 2004 (the "3253 Indy Mac Mortgage"), under which the Debtor granted Indy Mac a mortgage interest in the 3253 Hennepin property.  The 3253 Indy Mac Mortgage was recorded in the office of the Hennepin County Recorder on May 11, 2004 as document number 3959815.

As of the Filing Date, the unpaid balance under the Class 15 Note, including principal and unpaid interest, was approximately $422,000.

Treatment of Class 15 Claim

Indy Mac commenced a foreclosure by advertisement on the 3253 Holmes property and by virtue of Minnesota's anti-deficiency statute the Class 15 claim shall be allowed at $0.  To the extent the Debtor has any interest in this property, he surrenders any interest including any redemption interest.

Class 16-Satisfied Mortgages for which Satisfactions of Mortgage have not been recorded-Gregory C. Cole and Karen Cole (the "Coles") and Marco A. Herrera ("Herrera")

The Coles sold the Debtor his French Lake Township property and a purchase money mortgage was recorded with the Wright County Recorder on August 18, 2000 as document number 717140.  The debt underlying this mortgage has been satisfied in full.

Herrera sold the Debtor his 3201 Hennepin property and held two mortgages:  one dated June 11, 1996 and filed with the Hennepin County Recorder on July 2, 1996 as document number 6601360, and one dated December 17, 1997 and filed with the Hennepin County Recorder on December 22, 1997 as document number 6825241.

Treatment of Class 16

Class 16 shall receive nothing; confirmation of this Plan shall constitute an Order discharging the mortgages of record of the Coles and Herrera.

Class 17-State Bank of Delano-Boat Loan

The State Bank of Delano claims a secured interest in the Debtor's 1927 Hutchinson boat with a Chrysler motor and claims to be owed approximately $60,000.   The value of the boat is $12,000. Class 17 has obtained relief from stay related to the boat.

Treatment of Class 17

Unless otherwise agreed, Class 17 shall have an unsecured claim for any deficiency claim after it has sold the boat.

Class 18-Crown Bank-Boat Loan

Crown Bank claims a secured interest in the following boats:

> 1939 Larson 21' Falls Flyer
> 1957 Larson 14' Falls Flyer
> 1957 Larson 14' Falls Flyer
> 1955 Larson 14' Falls Flyer
> 1955 Aristo Craft 14' Torpedo
> 1913 17' Swedish Launch
> 1940-1950 Bunky Bowerman 18' Hydroplane
> 1940-1950 Swift Big Bee 18' Hydroplane
> 1974 Boston Whaler

Crown Bank is owed $63,647.37.  The value of the boats likely supports this amount.

Treatment of Class 18

Crown Bank has obtained motion for relief from stay to foreclose on its security interest.  At this time, Crown Bank has not taken action to foreclose.  If Crown Bank takes action to foreclose, it will have an unsecured claim in some undetermined amount.

If Crown Bank decides not to foreclose its security interest on the boats, the Debtor will pay Class 18 $63,647.37 in monthly payments amortized over 15 years at the rate of 5%.  Payments will be $537.09 and all outstanding principal and interest will be due on the 5th anniversary of the Effective Date.  The principal and outstanding interest may be paid at anytime without prepayment penalty.  Class 18 shall retain its lien on the boat to secure this treatment.  The remaining terms of the underlying loan documents will remain in effect.  To the extent the terms of the original underlying loan documents conflict with the terms of the Plan, the terms of the Plan shall control.

Class 19-First National Bank of the Lakes-Boat Loan

First National Bank of the Lakes has a lien on a 1989 Donzi and travel trailer.  The boat and trailer are worth $8500.  The debt is $8,500.

Treatment of Class 19

The Debtor will pay Class 19 $8,771.27 over 10 years at the rate of 6%. Payments will be $97.38. The principal and outstanding interest may be paid at anytime without prepayment penalty. Class 19 shall retain its lien on the boat to secure this treatment. The remaining terms of the underlying loan documents will remain in effect. To the extent the terms of the original underlying loan documents conflict with the terms of the Plan, the terms of the Plan shall control.

Class 20 - Priority Claims Under Section 507(a)(7)

Class 20 consists of all timely filed and allowed priority claims for security deposits paid prior to April 24, 2008 (the filing date of this case).

Treatment of Class 20

Class 20 Claims will be paid in full on the Effective Date unless the Debtor intends to object to such claim and in such case they will be paid on the eleventh (11th) day after the date on which such claim is allowed.

Class 21-Hennepin County Taxes 3022 Hennepin

Hennepin County has filed a proof of claim alleging a secured claim for Property taxes in the amount of $98,476.54. The Debtor disputes the claim as the taxes appear to have been calculated on a value for more than the purchase price of the property.

Treatment of Class 21.

The Debtor will pay Class 21 in full over 10 years at 4%, payments will be $997.03. The Debtor reserves the right to prepay this amount this amount with penalty and to seek a rebatement or other reduction in this amount.

## 2.2    Impaired and Unimpaired Classes

All classes of claims are impaired under the Plan.

## 2.3    Unclassified Claims – Description of Holders and Treatment of Claims

### 2.3.1    Pre-Petition Priority Government Claims

"Pre-Petition Priority Government Claims" consists of all timely filed and allowed claims of governmental units for pre-petition claims accorded a priority status pursuant to Section 507(a)(8) of the Bankruptcy Code. The Debtor does not believe that he is liable on any Pre-Petition Priority Government Claims. Pursuant to the mandates of Section 1123(a)(1) of the Bankruptcy Code, Pre-Petition Priority Government Claims are not classified in the Debtors' Plan.

Treatment of Pre-Petition Priority Government Claim

Pre-Petition Priority Government Claims will be paid, in full, over a term ending on or before the fifth anniversary of the Filing Date.  From and after the Effective Date, Pre-Petition Priority Government Claims will accrue interest on the terms and at the rate provided for in 26 U.S.C. §6621(b), and will be paid in periodic payments so that such claims are fully amortized and paid in full over a period ending not later than the date that is five years after the Filing Date.

### 2.3.2   Administrative Expenses

"Administrative Claim" means any claim for the payment of any administrative expense arising under Section 503(b) of the Bankruptcy Code.

Subject to the specific terms set forth below, the Debtors will pay each holder of an allowed Administrative Claim (except any such holder that agrees to different treatment) the allowed amount of such holder's allowed Administrative Claim, in cash, on the Effective Date; provided, however, that allowed Administrative Claims representing post-petition liabilities incurred in the ordinary course of business by the Debtors will be paid as they come due.

### (a)      Professional Fees

Professional fees that constitute Administrative Claims are the allowed fees and costs of the professionals that have been employed in the course of the Bankruptcy Case.

Assuming the relatively orderly administration of the Bankruptcy Case, the Debtors estimate that professional fees will accrue and be paid as follows:

| Professional | Estimated Fees & Costs | Amounts Paid and/or Retainer to be Applied | Amount to be Paid through Plan |
|---|---|---|---|
| Hinshaw & Culbertson LLP Attys. for Debtors | $65,000 | $20,000 | $45,000 |
| Romer & Associates | $7,500 | $0 | $7,500 |
| Experts for Confirmation | $1,000 | $0 | $1,000 |
| Coy & Associates | $15,000 | $0 | $15,626.50 |

Provided the professionals receive Bankruptcy Court approval of their fees and expenses, the claims for professional fees identified above will be paid in full in cash on the Effective Date, or on such date as the Court may fix, or upon such other terms as may be agreed upon by the professional and the Debtors.

**(b)      U.S. Trustee Fees and Court Costs**

U.S. Trustee fees and court costs that constitute Administrative Claims are those obligations imposed by operation of 28 U.S.C. §1930 (all such fees and costs will be referred to as "U.S. Trustee Fees").

The Debtors will pay all U.S. Trustee Fees owed by the Debtors, as and when due, until the Bankruptcy Case is closed.   In addition, the Debtors will continue to comply with all reporting requirements imposed by the U.S. Trustee until this Bankruptcy Case is closed.

**(c)      Other Administrative Expense Claims**

There may be other Administrative Claims, such as the following:  (1) filed proofs of claim for administrative expenses; (2) post-petition taxes; (3) unpaid post-petition claims incurred in the ordinary course of business; and (4) certain claims associated with executory contracts and unexpired leases (the treatment of claims arising out of executory contracts and unexpired leases is more fully described in Section 3.5 below) (all of the foregoing will be referred to as "Other Administrative Claims").  The Debtors has remained current on all of its post-petition obligations, and does not believe that it is liable on any Other Administrative Claims.

To the extent that there are any allowed Other Administrative Claims, such claims will be paid, in full and in cash, on the Effective Date, or as otherwise agreed to by the Debtors and the claimant, subject to the following exception:  For claims incurred in the ordinary course of business after the Filing Date, the Debtors will pay such claims as they become due, or otherwise in the ordinary course of Debtors' business.

**2.4      Executory Contracts and Unexpired Leases**

The Debtor is a parties to those executory contracts and unexpired leases described in Exhibit A, the Schedule of Executory Contracts and Leases.  Pursuant to Section 365 of the Bankruptcy Code, a debtor in possession may either (i) assume the contract, (ii) reject the contract, or (iii) assume and assign the contract.  The treatment that any contract or lease receives in the course of a bankruptcy case dictates the nature of the claim that the non-debtors party may have by reason of the contract or lease.  Generally, the rejection of a contract or lease will give rise to a general unsecured claim for damages and pre-petition arrearages, while the assumption of a contract or lease will require that all defaults be cured, and claims related to monetary defaults will be afforded priority status under the Bankruptcy Code.

The treatment of the various executory contracts and unexpired leases to which the Debtor is a party is specified in the Schedule of Executory Contracts and Leases.

From and after the date on which an order confirming the Plan is entered, the Debtor will timely perform his obligations according to the terms of all assumed contracts, as the same may be

modified by the terms of the Plan.  Notwithstanding the foregoing, with respect to arrearages outstanding as of the date on which a contract or lease is assumed, the Debtor will cure such arrearages promptly after the Effective Date, or as otherwise agreed to by the Debtor and the other party to any affected contract.

As to rejected contracts and leases, the parties to such contracts and leases may have claims arising under the terms of the relevant agreement, or arising from the rejection of the contract or lease, or both.  In accordance with the provisions of the Bankruptcy Code, any claim based on the rejection of an executory contract or unexpired lease will be treated as an unsecured claim.  Unless otherwise ordered by the Court, the deadline for filing a proof of claim for any such claim arising from rejection of a contract or lease will be fixed at 30 days from the date on which an order confirming the Plan is entered.  THE INFORMATION PROVIDED HEREIN CONSTITUTES NOTICE OF THE DEADLINE FOR ASSERTING CLAIMS FOR DAMAGES FROM REJECTION OF ANY EXECUTORY CONTRACT OR UNEXPIRED LEASE.

Contracts and Leases not Specified

If either or both Debtors are parties to any executory contracts or unexpired leases that are not specifically identified in the Schedule of Executory Contracts and Leases, the Debtors will REJECT all such executory contracts and unexpired leases, with the following exceptions:  (i) except as may be provided for in any prior Court order entered with respect to a motion for assumption or rejection of such executory contract or unexpired lease, and (ii) except as may be provided for in any motion pending before the Bankruptcy Court on the date of the hearing on confirmation of the Plan.  Except as may be provided otherwise herein, such rejection will be effective as of the date on which an order confirming the Plan is entered.

## III.  PROOFS OF CLAIMS AND OBJECTIONS TO CLAIMS

In general, creditors are permitted to file proofs of claims with the Bankruptcy Court pursuant to Bankruptcy Rules 3001 or 3002.  The deadline for timely filing a proof of claim for non-governmental creditors is September 16, 2008.

Certain creditors may hold or assert  claims for the payment of administrative expenses of the types described in Section 503(b) of the Bankruptcy Code.  Unless otherwise ordered by the Bankruptcy Court, the deadline by which administrative claims must be timely filed is thirty days after the date on which an order confirming the Plan is entered.  Administrative expense claims must be asserted by motion filed and served by the deadline set forth herein.  SUBJECT TO SUBSEQUENT ORDER OF THE BANKRUPTCY COURT, THIS INFORMATION CONSTITUTES NOTICE OF THE DEADLINE FOR ASSERTING ADMINISTRATIVE EXPENSE CLAIMS.

Certain creditors may have claims arising from the rejection of executory contracts or unexpired leases, whether rejected under the Plan or pursuant to a motion filed during the pendency of the Bankruptcy Case.  Claims for damages arising out of such rejection must be asserted by the filing of a proof of claim within thirty days after the date on which an order confirming the Plan

is entered.  Parties to executory contracts and unexpired leases that have been or may yet be rejected by the Debtor, by motion or otherwise, at or before confirmation  must file proofs of claims for any damages from such rejection in accordance with the Bankruptcy Court's order approving such rejection, or, if the order does not so provide, pursuant to the terms of this paragraph.  THE INFORMATION PROVIDED HEREIN CONSTITUTES NOTICE OF THE DEADLINE FOR ASSERTING CLAIMS FOR DAMAGES FROM REJECTION OF ANY EXECUTORY CONTRACT OR UNEXPIRED LEASE.

## IV.  CLAIMS OF THE DEBTORS AGAINST OTHERS

### 4.1    Claims from Bankruptcy Laws – Preferences, etc.

The bankruptcy laws create a number of claims and causes of action that a debtors-in-possession may pursue for the benefit of the bankruptcy estate.  Among the rights of recovery that are available to a debtors-in-possession are those based on theories of preferential and fraudulent transfer.

A preference is a payment or other transfer of property to or for the benefit of a creditor, before the bankruptcy case was commenced, on account of an antecedent debt, that: (1) was made while the debtors was insolvent; (2) was made within the time period(s) specified in Section 547(b)(4) of the Bankruptcy Code; and (3) enabled the creditor receiving the transfer to receive more than the creditor would receive if the case were a case under Chapter 7 of the Bankruptcy Code. When a debtors avoids a preferential transfer, the preference defendant is required to return the payment or other transfer made, and the preference defendant then ordinarily has an unsecured claim in the amount of the returned preference.

An avoidable fraudulent conveyance under the bankruptcy laws is a transfer of an interest of the debtors in property, or any obligation incurred by the debtors, that was either: (a) undertaken with actual intent to hinder, delay, or defraud any present or future creditor; or (b) a transaction under which the debtors received less than a reasonably equivalent value, and (i) the debtors was insolvent on the date the transfer was made or such obligation was incurred or became insolvent as a result of such transfer or obligation; (ii) the debtors was engaged in business or a transaction, or was about to engage in such business or transaction for which the debtors' remaining assets would be insufficient; or (iii) the debtors intended to incur or believed that it would incur debts that would be beyond the debtors' ability to pay as such debts matured.

Based on a review of his records so far, the Debtor believes that there are the following constructively fraudulent or preferential transfers that would be subject to avoidance:

> Commerce Bank's 3990 Sunset Mortgage
> Commerce Bank's  4400 Deering Island Mortgage
> Commerce Bank's claimed lien on exempt personal property

The Debtor will continue his review and will pursue any avoidance actions that they determine are likely to generate recoveries for the benefit of creditors.  Any cash proceeds recovered by reason of the disposition of any avoidance action will be used first to pay administrative

expenses associated with such avoidance action, and the remainder will be paid to Class 1 Creditors on a pro rata basis.

## 4.2    Setoffs

Subject to the limitations provided in Section 553 of the Bankruptcy Code, the Debtors may, but will not be required to, setoff against any claim and the payments or other distributions to be made pursuant to the Plan in respect of such claim, claims of any nature whatsoever the Debtors may have against the holder of such claim.  Neither the failure to setoff, nor the allowance of any claim hereunder will constitute a waiver or release by the Debtors of any such claim that the Debtors may have against such holder.

## V.  POST CONFIRMATION

### 5.1    Means for Execution

### 5.1.1   Plan Funding

The Debtor will continue to earn income from the operation of rental properties that are retained and by operation of his theatre.  The Debtor also intended to enter into a lease with a new operator for his bar in Belgrade, Minnesota, but the proposed lessee was unable to obtain financing.  Projections of expected income for the Debtor's properties and the theatre are attached as Exhibit C.  The projections were prepared by the Debtor and his accountants at Romer & Associates.  Assumptions were that the rental units would be 90% occupied and that the Debtor would have approximately eight events per month at the theatre.

Historically, up until approximately September 2007 when the events with Commerce  Bank described above occurred, the Debtor was timely with each and every payment due under any of his loan documents with all of his lenders, with the exception of some property taxes.  Operating reports during the case are available upon request to Debtor's counsel.  Also, attached is a report regarding the income and expenses of the theatre prior to the bankruptcy case.

### 5.1.2   Plan Distributions

The distributions under the Plan will be made by the Debtor on the dates provided for in the Plan, or on such earlier dates as the Debtor, in his sole discretion, may choose.  The Debtor reserves and retains the right to prepay any obligation under the Plan without penalty.  Any payment or distribution required to be made under this Plan on a day other than a business day will be made on the next succeeding business day, or as soon thereafter as practicable.

The Debtor will not be required to make any payment or distribution on account of any disputed claim until the dispute has been resolved and then only to the extent that the disputed claim becomes an allowed claim, whether by agreement of the parties or by final order of the Bankruptcy Court.  As soon as practicable after a claim dispute is resolved, and subject to the terms of the Plan, the Debtor will pay and distribute to the holder of such allowed claim the amount provided in the Plan in the manner provided in the Plan, subject to the following

condition:  The Debtor may choose, in the alternative, to make any additional payment or distribution to the creditor holding a previously disputed allowed claim to bring distributions on account of such claim current with where they would have been had the claim never been subject to objection.

In the event that any property to be distributed under the Plan remains unclaimed or otherwise not deliverable to a creditor entitled thereto as of the later of: (a) one year after the date on which an order confirming the Plan is entered; or (b) one hundred twenty (120) days after any distribution called for under the terms of the Plan, such property will become vested in and will be transferred and delivered to the Debtors.  Unclaimed property includes, but is not limited to, checks issued pursuant to the Plan and not negotiated within ninety (90) days of the date such check was issued.

The Debtor will withhold from any property distributed under this Plan, any amounts required to be withheld for federal, state, or local taxes.  The issuance, transfer or exchange of any of the securities issued under, or the transfer of any other property pursuant to this Plan, or the making or delivery of an instrument of transfer under this Plan, is exempt from application of any law imposing a stamp tax, transfer tax, or other similar tax.

Except as expressly stated in the Plan or otherwise allowed by a final order of the Bankruptcy Court, no interest, penalty, or late charge arising after the Filing Date will be allowed on any claim, regardless of whether there is any objection to the claim.  No attorneys' fees will be paid with respect to any claim except as specified in the Plan, or as allowed by a final order of the Bankruptcy Court.

Distributions to be made under this Plan to holders of allowed claims will be delivered by first class United Sates mail, postage prepaid to (a) the latest mailing address set forth in the schedules if no proof of claim was filed with respect to such claim; or (b) to the address appearing on a proof of claim as the address to which notices should be sent if a proof of claim was filed with respect to such claim.  Distributions will be deemed made as of the time they are deposited in the United States mail.

Any notices related to the Plan must be addressed as follows:

Donald Driggs
3201 Hennepin Ave.
Minneapolis MN 55391

**and**

Jamie R. Pierce
Hinshaw & Culbertson LLP
Suite 2000
33 S. 7th St.
Mpls, MN 55402

### 5.1.3   Implementation of Plan

The Plan will be implemented upon entry of an order confirming the Plan.

The Plan may be modified in the manner provided for under Section 1127 of the Code.  The Debtor will give notice of any proposed modification to the United States Trustee and to any other parties designated by applicable rules or by Court order.  The Debtor reserves the right to make such modifications at any hearing on confirmation as may be necessary to facilitate confirmation of the Plan, as well as the right to seek modification after confirmation to the full extent permitted under the Bankruptcy Code.

The Debtor's obligations under the Plan are contingent upon entry of an order confirming the Plan, and said order not being stayed, appealed, or otherwise challenged before the expiration of the applicable deadline; provided, however, that the Debtor may, in his sole discretion, choose to undertake and perform its obligations under the Plan notwithstanding the pendency of an appeal.

### 5.2   Reservation of Rights, Powers and Jurisdiction

### 5.2.1   Rights and Powers

Except as otherwise expressly provided in the Plan, the Debtor will retain, after confirmation of the Plan, full right and power to do any of the following:

(a)      Object to the allowance of claims;

(b)      Seek subordination of claims;

(c)      Pursue any claims against third parties, including, but not limited to those based on theories of preference, fraudulent transfer, or any other action arising under Chapter 5 of the Bankruptcy Code;

(d)      Pursue any claims and enforce any rights arising under the Bankruptcy Code in favor of a trustee or debtors-in-possession; and

(e)      Pursue any causes of action that the Debtors may have as of the date on which an order confirming the Plan is entered.  Except to the extent explicitly released under the terms of the Plan, any and all causes of action that the Debtors may have had prior to confirmation of the Plan will survive confirmation of the Plan, will vest in the Debtors as of confirmation of the Plan, and will not be affected by confirmation or the passing of the Effective Date of the Plan.

The Debtors may object to the allowance of claims within the time period provided for in the order confirming the plan, or as otherwise dictated by order of the Court.  The Debtors' authority to object to the allowance of claims will not be affected in any way by the Debtors' failure to object to allowance of any claim for purposes of voting.

### 5.2.2   Court Approval

After confirmation of the Plan, the Debtors may, but will not required to, seek the Court's approval of any of the following:

(a)      settlements regarding objections to claims;

(b)      settlements regarding claims against third parties;

(c)      settlements regarding allowance of fees and expenses incurred by professionals employed during the pendency of the Bankruptcy Case.

If the Debtors choose to seek court approval of any such settlements, the Debtors will not be required to provide notice to creditors as would typically be provided during the chapter 11 case or to file and serve a motion for the approval of the settlement.  Instead, the Debtors will be authorized to seek approval by filing a stipulation setting forth the material terms of the settlement, along with a proposed order providing for the approval of such stipulation.

### 5.2.3   Jurisdiction

Until the Plan has been fully consummated, the Court will retain jurisdiction over, and the Debtors will retain standing and the right to pursue any cause of action, proceeding, or other request for relief related to the following:

(a)      classification of the claims of creditors;

(b)      determination of the allowed amount of any claims arising before or during the pendency of the Bankruptcy Case;

(c)      subordination of the allowed claims of creditors or liens or other interests securing such claims;

(d)      determination of any counterclaims against any creditor, including any claim for turnover of property of the Debtors and any claim for offset of the value of the property against the claim of the creditor;

(e)      determination of the allowed amount of claims for damages from the rejection of executory contracts or unexpired leases;

(f)      determination of all issues and disputes regarding title to the assets of the estate and the Debtors;

(g)      determination of all causes of actions between the Debtors and any other party, including, but not limited to, any right of the Debtors to recover assets pursuant to the provisions of the Bankruptcy Code, and to avoid any preferential or fraudulent transfers;

(h)      correction of any defect, the curing of any omission or the reconciliation of any inconsistency of the Plan or the order confirming the Plan as may be necessary to carry out the purpose and intent of the Plan;

(i)      interpretation and enforcement of the terms of the Plan;

(j)      shortening or extending, for cause, any time fixed for doing any act or thing under the Plan;

(k)      entry of any order, including any injunction, necessary to enforce the title, rights, and powers of the Debtors;

(l)      entry of an order concluding and terminating the case; and

(m)      approval of any settlement related to any of the foregoing.

The Debtors' transfer or assignment of any interests or rights will not affect the Court's retention of jurisdiction to the full extent provided herein.

### 5.3      Effects of Plan Confirmation

### 5.3.1   Binding Effect

The Plan will be binding upon and inure to the benefit of the Debtors, all present and former holders of claims against, or interests in, the Debtors, and all respective successors and assigns.

### 5.3.2   Discharge and Injunction

THE DEBTOR SHALL RECEIVE HIS DISCHARGE UPON COMPLETION OF PAYMENTS TO CLASS 1 CREDITORS.

TO THE FULL EXTENT PROVIDED FOR IN SECTION 1141 OF THE CODE, AND SUBJECT TO ANY EXCEPTION OR QUALIFICATION UNDER SUCH SECTION, THE DEBTOR WILL BE ENTITLED TO ENTRY OF AN ORDER PROVIDING FOR THE COMPLETE DISCHARGE, WAIVER, RELEASE, AND SATISFACTION OF ALL CLAIMS AGAINST THE DEBTOR AS OF THE FILING DATE.  THE DISCHARGE WILL OPERATE TO RELEASE AND EXTINGUISH ANY PURPORTED LIENS, ENCUMBRANCES, OR SECURITY INTERESTS CLAIMED BY A CLAIMANT OR ANY OTHER ENTITY AGAINST PROPERTY OF THE DEBTORS, PROPERTY DEALT WITH BY THE PLAN, AND PROPERTY OF THE ESTATE, EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN.  THE ORDER CONFIRMING THE PLAN IS A GENERAL ADJUDICATION AND RESOLUTION WITH PREJUDICE OF ALL PENDING LEGAL

PROCEEDINGS AGAINST THE DEBTORS, PROPERTY OF THE DEBTOR, OR PROPERTY OF THE ESTATE, EXCEPT AS OTHERWISE PROVIDED IN THE PLAN.

THE DISCHARGE AND THE ORDER CONFIRMING THE PLAN OPERATE AS AN INJUNCTION TO THE EXTENT PROVIDED IN SECTION 524 OF THE BANKRUPTCY CODE, AND ONLY TO SUCH EXTENT.  ANY CREDITOR OR EQUITY HOLDER ENTITLED TO RECEIVE ANY DISTRIBUTION PURSUANT TO THIS PLAN WILL BE PRESUMED CONCLUSIVELY TO HAVE RELEASED THE DEBTORS FROM ANY CLAIM RELATED TO THAT WITH RESPECT TO WHICH THE DISTRIBUTION IS MADE.  THIS RELEASE WILL BE ENFORCEABLE AS A MATTER OF CONTRACT AGAINST ANY CREDITOR OR EQUITY HOLDER THAT ACQUIRES ANY RIGHT TO DISTRIBUTION PURSUANT TO THIS PLAN.

SUBJECT TO ANY LIMITATIONS PROVIDED FOR IN THE BANKRUPTCY CODE, UNLESS A TAXING AUTHORITY HAS ASSERTED A CLAIM AGAINST THE DEBTORS BEFORE THE DEADLINE FOR FILING CLAIMS, CONFIRMATION OF THE PLAN WILL OPERATE AS A DISCHARGE OF ANY CLAIM OR LIEN OF ANY TAXING AUTHORITY AGAINST THE DEBTORS, THE ESTATE, ANY PROPERTY OF THE DEBTORS, AND ANY PROPERTY OF THE ESTATE, FOR ANY TAXES, PENALTIES, OR INTEREST: (I) FOR ANY TAX YEAR FOR A PERIOD BEFORE THE FILING DATE; (II) ARISING OUT OF THE FAILURE OF THE DEBTORS TO FILE ANY TAX RETURN; OR (III) ARISING OUT OF AN AUDIT OF ANY TAX RETURN WITH RESPECT TO A PERIOD BEFORE THE FILING DATE.

### 5.3.3   Re-Vesting

Subject to the terms of the Plan, on the date that the order confirming the Plan is entered, the Debtor will be restored to full ownership of all property owned by the Debtor, all property of the estate, and all other rights and interests .  The property so vested in the Debtor will be free and clear of all claims, liens, encumbrances, charges, and other interests of holders of claims or interests, except as otherwise provided in the Plan.

On and after the date on which the order confirming the Plan is entered, the Debtor may freely use, acquire, and dispose of property of the estate and property of the Debtor, except as otherwise provided in the Plan.  Except as may otherwise be expressly provided for in the Plan or by order of the Court, the Debtor's    operation of his business and use of property will not be subject to any restrictions imposed by operation of the Bankruptcy Code, the Bankruptcy Rules, or any prior Bankruptcy Court order entered during the bankruptcy case.

## X. CONCLUSION

The Debtor believes that acceptance of the Plan is in the best interest of all parties and therefore urges all holders of claims and interests to vote in favor of the Plan.

Dated: April 27, 2009

Donald A. Driggs


Dated: April 27, 2009

**HINSHAW & CULBERTSON LLP**

By:   /e/  Jamie R. Pierce
      Thomas G. Wallrich (213354)
      Jamie R. Pierce (305054)
      Suite 2000
      333 South Seventh Street
      Minneapolis, MN 55402-4511
      Telephone (612) 334-2514

**ATTORNEYS FOR DEBTOR**

**EXHIBIT A SCHEDULE OF EXECUTORY CONTRACTS TO BE ASSUMED**

The Debtor will assume all tenant leases in effect on the Effective Date.

## FORBEARANCE AND LOAN MODIFICATION AGREEMENT

This Forbearance and Loan Modification Agreement (this "Agreement") is dated for purposes of identification as of the 27th day of April, 2009, but shall be effective as and to the extent provided below, by and between Commerce Bank (the "Bank"), a Minnesota banking corporation, and Donald A. Driggs, also known as Donald Andrew Driggs, a single person ("Driggs"), and is based on the following facts:

A.     Driggs is indebted to the Bank pursuant to the following described Promissory Notes (collectively, the "Notes"), and other promissory notes: (1) that certain Promissory Note, dated June 29, 2007, made, executed and delivered by Driggs to the order of the Bank in the stated principal amount of $501,109.13 ("Note A"), and (2) that certain Promissory Note, dated July 31, 2007, made, executed and delivered by Driggs to the order of the Bank in the stated principal amount of $175,000.00 ("Note D"); each of which evidences an actual loan made by the Bank to Driggs (which loans are referred to as "Loan A" and "Loan D," respectively).

B.     Note A is a renewal and replacement of a certain Promissory Note, dated March 29, 2004, made, executed and delivered by Driggs to the order of the Bank in the stated principal amount of $525,000.00 ("Original Note A").

C.     Original Note A was, and Note A is, secured by: (1) a certain Mortgage, dated March 29, 2004, granted by Driggs to the Bank, which was recorded in the office of the County Recorder in and for Hennepin County, Minnesota on March 30, 2004 as Document No. 3939938 ("Mortgage A"), encumbering real property legally described as Lot 6, Block 16, "Calhoun Park," Hennepin County, Minnesota (the "Theater Parcel"); and (2) a certain Commercial Security Agreement, dated March 29, 2004 (the "Security Agreement"), granted by Driggs to the Bank, pursuant to which Driggs granted to the Bank a security interest (the "Security Interest") in various personal property described in the Security Agreement (the "Personal Property"), and which security interest was perfected by the filing of a UCC Financing Statement in the office of the Secretary of State of the State of Minnesota on April 1, 2004 as File No. 200411214386, which perfection was continued by the filing in said office of a UCC continuation statement on March 23, 2009 as File No. 20091542111.

D.     Note D is secured by: (1) a certain Mortgage, dated July 31, 2007, granted by Driggs to the Bank, which was recorded in the office of the County Recorder in and for Ramsey County, Minnesota on August 22, 2007 as Document No. 4050226 ("Mortgage D"), encumbering real property legally described as Lot 13, Block 3, Bryant's Addition to St. Paul, Ramsey County, Minnesota (the "Portland Parcel"); and (2) the Security Agreement.

E.     Driggs is a debtor under Chapter 11 of the United States Bankruptcy Code in Case No. 08-41984 (the "Bankruptcy Case") now pending in the United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court").

F.     Each of the Notes, Mortgage A, Mortgage D and the Security Agreement is, and for more than one (1) month has been, in default as of the date of this Agreement.



G.    Driggs has requested that the Bank agree to forbear from collection on, and modify the terms of, the Notes, Mortgage A, Mortgage D and the Security Agreement.

H.    The Bank has agreed to forbear from collection on, and to modify the terms of, the Notes, Mortgage A, Mortgage D and the Security Agreement, subject to certain terms and conditions, including without limitation the condition that Driggs execute, deliver and perform the terms of this Agreement.

I.    The Bank and Driggs wish to set forth in writing the terms of their agreement with respect to such forbearance.

NOW, THEREFORE, in consideration of the facts stated above, the mutual covenants and agreements set forth below and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each of the parties to this Agreement, the parties hereby agree as follows:

1.    Recitals Incorporated.  The facts stated above are hereby incorporated into this Agreement and made a part hereof by reference.

2.    Status of Loan A.  Driggs and the Bank hereby agree that: (a) as of March 9, 2009, the unpaid balance of Note A, exclusive of costs of collection, including reasonable attorney's fees, incurred by the Bank after February 28, 2009, is $673,515.95, composed of (1) $501,109.13 of principal, and (2) $102,091.39 of interest through March 9, 2009 and costs of collection, including reasonable attorney's fees, incurred through February 28, 2009; and (b) additional interest has accrued after March 9, 2009 and additional costs of collection, including reasonable attorney's fees, have been incurred after February 28, 2009, such that the unpaid balance of Loan A is approximately $700,000.00 as of the date of this Agreement.

3.    Status of Loan D.  Driggs and the Bank hereby agree that: (a) as of March 9, 2009, the unpaid balance of the Note D, exclusive of costs of collection, including reasonable attorney's fees, incurred by the Bank after February 28, 2009, is $194,601.95, composed of (1) $159,370.17 of principal, and (2) $35,231.78 of interest through March 9, 2009 and costs of collection, including reasonable attorney's fees, incurred through February 28, 2009; and (b) additional interest has accrued after March 9, 2009 and additional costs of collection, including reasonable attorney's fees, have been incurred after February 28, 2009.

4.    Conditions to Effectiveness of Forbearances and Modifications.  The forbearances and modifications set forth in sections 5 and 6 of this Agreement shall not become effective unless and until each of the following conditions shall have been satisfied, not later than April 30, 2009:  (a) the Bankruptcy Court shall have approved a Plan of Reorganization in the Bankruptcy Case (the "Plan") that does not conflict with the terms of this Agreement and that otherwise is acceptable to the Bank in its sole discretion; (b) Driggs executes and delivers to the Bank, in recordable form, an Agreement for Voluntary Foreclosure of Mortgage with respect to Mortgage A (the "Mortgage A Voluntary Foreclosure Agreement"), and a Memorandum thereof (the "Mortgage A Memorandum"), and an Agreement for Voluntary Foreclosure of Mortgage with respect to Mortgage D (the "Mortgage D Voluntary Foreclosure Agreement"), and a Memorandum thereof (the "Mortgage D Memorandum"), the form and substance of each of

which shall be acceptable to the Bank in its sole discretion and each of which shall have as an effective date or "date of agreement" the effective date of the Plan (the "Effective Date"); and (c) the unpaid balance as of the Effective Date that is or may be secured by the first mortgage on the Portland Parcel (the "Portland First Mortgage") may not exceed $425,000.00. Driggs hereby agrees that, if any of the foregoing conditions is not satisfied on or before April 30, 2009, Driggs shall not object to the Bank receiving relief from the automatic stay with respect to any obligation of Driggs to the Bank; and sections 5 and 6 of this Agreement shall never become effective; but the rest of this Agreement, and the Mortgage A Voluntary Foreclosure Agreement and the Mortgage D Voluntary Foreclosure Agreement, each shall be effective as of the date of execution and delivery thereof by the Bank and Driggs. Driggs further acknowledges and agrees that Driggs' execution and delivery of this Agreement is a condition precedent to the Bank's withdrawal of its objection to, and approval of, the Plan.

     5.    <u>Forbearance on and Modification of Loan A</u>. The Bank hereby agrees as of the Effective Date that, so long as no Default exists under this Agreement, the Bank will take no action to collect Note A, to foreclose Mortgage A, to foreclose the Security Interest as a result of a default under Note A or Mortgage A, or to take possession of the Theater Parcel as permitted under the Mortgage A Voluntary Foreclosure Agreement. The Bank and Driggs hereby agree that, as of the Effective Date, Note A, Mortgage A and the Security Agreement will be amended as provided in the Plan for "Class 14(a)", except as otherwise provided in this section 5. This section 5 shall clarify the provisions of the Plan with respect to "Class 14(a)." In the event of any conflict between this Agreement and the Plan with respect to Loan A and Class 14(a), this section 5 shall control.

     (a)    The unpaid principal balance of Note A, all accrued and unpaid interest thereon, and any other amounts owing under Note A, Mortgage A or the Security Agreement as of the Effective Date, conclusively shall be deemed to equal $700,000.00, which shall constitute the "Adjusted Loan A Principal Balance."

     (b)    The unpaid balance of the Adjusted Loan A Principal Balance (the "Loan A Principal Balance") shall bear interest from the Effective Date until paid at a fixed rate equal to six percent (6%) per annum (the "Accrual Rate"), except as otherwise provided below.

     (c)    Interest only on the Loan A Principal Balance, at the rate of four percent (4%) per annum (the "Pay Rate"), shall be due and payable monthly, on the date that is thirty (30) days after the Effective Date, and on the same day of each and every calendar month thereafter through and including December of 2009. Thereafter, monthly installments of principal and interest shall be due on the same day of January, 2010, and on the same day of each and every calendar month thereafter until June 1, 2012 (the "Extended Note A Maturity Date"), at which time the entire Loan A Principal Balance, all accrued and unpaid interest thereon including interest that accrued at the Accrual Rate, and any other amounts owing under Note A, Mortgage A or the Security Agreement, each as hereby amended, shall be due and payable in full, except as otherwise provided in section 5(d) below. Such monthly installments of principal and interest shall be calculated based on the Loan A Principal Balance as of January 1, 2010, the Pay Rate, and a 30-year amortization period.

(d)      Driggs shall use good faith efforts, during the six (6) months preceding the Extended Note A Maturity Date, to obtain refinancing of Loan A from a source other than the Bank, and shall provide to the Bank, promptly upon request by the Bank, evidence of all such efforts. If, in spite of such good faith efforts, Driggs is unable to obtain refinancing of Loan A but Driggs has paid and performed Driggs' obligations to the Bank under the Plan and this Agreement that became due prior to the Extended Note A Maturity Date, upon request by Driggs the Bank and Driggs shall enter into an agreement (the "2012 Loan A Modification Agreement"), having an effective date of the Extended Note A Maturity Date, modifying the terms of Note A, Mortgage A and the Security Agreement, each as hereby amended. The 2012 Loan A Modification Agreement shall be in form and substance acceptable to the Bank, and shall include the following provisions: (1) the interest rate on Loan A shall be amended to be a rate (the "2012 Loan A Rate"), from the Extended Note A Maturity Date and until Loan A is paid in full, equal to the rate provided in the Plan; (2) the maturity date of Loan A shall be further extended to June 1, 2014 (the "Absolute Loan A Maturity Date"); and (3) monthly installments of principal and interest, calculated based on the 2012 Loan A Rate, the Loan A Principal Balance immediately preceding the Extended Note A Maturity Date, and a 28-year amortization period, shall be due and payable on the Extended Note A Maturity Date, and on the first day of each and every calendar month thereafter until the Absolute Note A Maturity Date, at which time the entire Loan A Principal Balance, all accrued and unpaid interest thereon, and any other amounts owing under Note A, Mortgage A and the Security Agreement, each as hereby amended, shall be due and payable in full.

(e)      It shall be a breach of Mortgage A if the ratio for the Theater Parcel of (a) earnings before interest, taxes, depreciation and amortization, calculated in accordance with generally accepted accounting principles,  to (b) interest and any required principal amortization on Loan A and the subordinate mortgage on the Theater Parcel described below, is less than 1.00:1.00 for calendar year 2010, or less than 1.20:1.00 during calendar year 2011 and thereafter until Loan A is paid in full.

6.      Forbearance on and Modification of Loan D.  The Bank hereby agrees as of the Effective Date that, so long as no Default exists under this Agreement, the Bank will take no action to collect Note D, to foreclose Mortgage D, or to foreclose the Security Interest as a result of a default under Note D or Mortgage D, or to take possession of the Portland Parcel as permitted under the Mortgage D Voluntary Foreclosure Agreement. The Bank and Driggs hereby agree that, as of the Effective Date, Note D, Mortgage D and the Security Agreement will be amended as provided in the Plan for "Class 14(d)", except as otherwise provided in this section 6.  This section 6 shall clarify the provisions of the Plan with respect to "Class 14(d)." In the event of any conflict between this Agreement and the Plan with respect to Loan D and Class 14(d), this section 6 shall control.

(a)      The unpaid principal balance of Note D, all accrued and unpaid interest thereon, and any other amounts owing under Note D, Mortgage D or the Security Agreement as of the Effective Date, conclusively shall be deemed to equal $160,000.00, which shall constitute the "Adjusted Loan D Principal Balance."

(b)    The unpaid balance of the Adjusted Loan D Principal Balance (the "Loan D Principal Balance") shall bear interest from the Effective Date until paid at a fixed rate equal to the Accrual Rate, except as otherwise provided below.

(c)    Interest only on the Loan D Principal Balance at the Pay Rate shall be due and payable monthly, on the date that is thirty (30) days after the Effective Date, and on the same day of each and every calendar month thereafter through and including December of 2009. Thereafter, monthly installments of principal and interest shall be due on the same day of January, 2010, and on the same day of each and every calendar month thereafter until the third anniversary of the Effective Date (the "Extended Note D Maturity Date"), at which time the entire Loan D Principal Balance, all accrued and unpaid interest thereon including interest that accrued at the Accrual Rate, and any other amounts owing under Note D, Mortgage D or the Security Agreement, shall be due and payable in full except as otherwise provided in section 6(e) below. Monthly installments of principal and interest shall be calculated based on the Loan D Principal Balance as of January 1, 2010, the Pay Rate, and a 30-year amortization period.

(d)    Driggs shall use good faith efforts, during the six (6) months preceding the Extended Note D Maturity Date, to obtain refinancing of Loan D from a source other than the Bank, and shall provide to the Bank, promptly upon request by the Bank, evidence of all such efforts. If, in spite of such good faith efforts, Driggs is unable to obtain refinancing of Loan D but Driggs has paid and performed Driggs' obligations to the Bank under this Agreement that became due prior to the Extended Note D Maturity Agreement, upon request by Driggs the Bank and Driggs shall enter into an agreement (the "2012 Loan D Modification Agreement"), having an effective date of the Extended Note D Maturity Date, modifying the terms of Note D and Mortgage D, each as hereby amended. The 2012 Loan D Modification Agreement shall be in form and substance acceptable to the Bank, and shall include the following provisions: (1) the interest rate on Loan D shall be amended to be a rate (the "2012 Loan D Rate"), from the Extended Note D Maturity Date and until Loan D is paid in full, equal to the rate provided in the Plan; (2) the maturity date of Loan D shall be further extended to June 1, 2014 (the "Absolute Loan D Maturity Date"); and (3) monthly installments of principal and interest, calculated based on the 2012 Loan D Rate, the Loan D Principal Balance immediately preceding the Extended Note D Maturity Date, and a 28-year amortization period, shall be due and payable on the Extended Note D Maturity Date, and on the first day of each and every calendar month thereafter until the Absolute Note D Maturity Date, at which time the entire Loan D Principal Balance, all accrued and unpaid interest thereon, and any other amounts owing under Note D or Mortgage D, each as hereby amended, shall be due and payable in full.

7.    Application of Payments. Unless and until a Default exists under this Agreement, the Bank shall apply all amounts received on or after the date of this Agreement on either of Loan A or Loan D as directed by the party paying such amount. In the absence of such direction, or at any time that a Default has occurred and is continuing, the Bank shall apply all such amounts as determined by the Bank in its sole and absolute discretion.

8.    Default. A Loan A Default shall occur if Driggs fails promptly to pay or perform, when due, any obligation under any of Note A, Mortgage A, or the Security Agreement, each as hereby amended, or section 5 of this Agreement, and such failure continues for thirty (30) days after "Notice" from the Bank to Driggs. A Loan D Default shall occur if Driggs fails

promptly to pay or perform, when due, any obligation under either of Note D or Mortgage D, each as hereby amended, or section 6 of this Agreement, and such failure continues for thirty (30) days after "Notice" from the Bank to Driggs. "Notice" means any of: telephoned notice, faxed notice, e-mail notice, or written notice either personally delivered or mailed to Driggs. Upon a Loan A Default occurring under this Agreement, the Bank shall have all rights and remedies granted under applicable law or the terms of Note A, Mortgage A, and/or the Security Agreement, each as hereby amended, and under the Mortgage A Voluntary Foreclosure Agreement. Upon a Loan D Default occurring under this Agreement, the Bank shall have all rights and remedies granted under applicable law or the terms of Note D and Mortgage D, each as hereby amended, and under the Mortgage D Voluntary Foreclosure Agreement.

9.     <u>Release of Claims</u>.  Driggs hereby releases any and all claims which he may have against the Bank, or any director, officer, shareholder or agent of the Bank, for any act or omission occurring prior to the Effective Date.

10.     <u>No Novation</u>.  Driggs acknowledges and agrees that the Notes as amended by this Agreement are not a novation of the Notes previously executed or indebtedness previously incurred, and that the Notes as hereby amended are an extension of the Notes and the indebtedness previously incurred to the Bank.  Driggs hereby acknowledges and agrees that the Bank retains all claims, rights and causes of action on the Notes, Mortgage A, Mortgage D and the Security Agreement, if any, that it possessed against Driggs prior to the execution and delivery of this Agreement, and all such rights, claims and causes of action shall remain unaffected by this Agreement except to the extent expressly provided in this Agreement.

11.     <u>Counterparts</u>.  This Agreement may be executed in any number of multiple counterparts, each of which shall constitute an original but all of which together shall constitute a single agreement.

12..     <u>Survival</u>.  Except to the extent as is otherwise expressly provided in this Agreement, all of the terms of each of the Notes, Mortgage A, Mortgage D and the Security Agreement, shall remain in full force and effect.

13.     <u>Counsel</u>.  Borrower represents to the Bank that Borrower has had adequate opportunity to consult with such legal, accounting and other counsel as Borrower has deemed necessary or appropriate in connection with the negotiation, documentation and implementation of this Agreement.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed, effective as provided above.

**The Bank:**
Commerce Bank

By:_____
Its:_____

**Driggs:**

_____
Donald A. Driggs

1354197v6                               6

## EXHIBIT 14(a)

Commerce Bank's security interest includes Accounts and Other Rights to Payment, Inventory, Instruments and Chattel Paper, General Intangibles, and Deposit Accounts arising from the operation of the Suburban World Theatre, and the following personal property located at the theatre: .

- 2 Stanchions
- Scotsman ice machine
- Carbo-mizer~ Property of Co2 services
- DCS 6 burner stove oven
- Vulcan grill/ double deep fryer
- True refrigerator/ pizza prep
- Single door refrigerator/ pizza prep
- Greenheck kitchen ventilation system
- Kidde fire system
- Full sized 3 bottom door refrigerator/ prep table with Hatco Glo-ray warmer. Compressor does not work.
- Arctic walk-in freezer
- Crowntonka walk-in cooler
- ES200 dishwasher with PSM ventilation
- Full built in metal shelving with table for dishes
- 3 basin waterline sink
- A total of 3 single hand washing sinks
- A custom NSF wine rack in beverage room
- Arctic custom walk-in cooler
- 132 blue chairs
- 35 blue tables
- 3 booster seats
- Xetron Kelmar system projector
- Alpha platter system
- National supply company Gold Berg bros. Model B
- Dolby stereo Cm-35 monitor
- Computer desk
- Meilink safe
- 4 dry erase boards

Donald Andrew Driggs certifies that the above list of personal property includes all of the personal property related to the Suburban World Theatre.